**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 19-2108**

———————————

DARLENE GIBBS; STEPHANIE EDWARDS; LULA WILLIAMS; PATRICK INSCHO; LAWRENCE MWETHUKU; GEORGE HENGLE; TAMARA PRICE; SHERRY BLACKBURN, on behalf of themselves and all individuals similarly situated,

        Plaintiffs – Appellees,

    v.

SEQUOIA CAPITAL OPERATIONS, LLC; SEQUOIA CAPITAL FRANCHISE PARTNERS, L.P.; SEQUOIA CAPITAL IX, L.P.; SEQUOIA ENTREPRENEURS ANNEX FUND, L.P.; SEQUIOA CAPITAL GROWTH III PRINCIPALS FUND, LLC; SEQUOIA CAPITAL FRANCHISE FUND, L.P.; SEQUOIA CAPITAL GROWTH PARTNERS III, L.P.; SEQUOIA CAPITAL GROWTH FUND III, L.P.,

        Defendants – Appellants,

and

MICHAEL STINSON; 7HBF NO. 2; JOHN DREW; TECHNOLOGY CROSSOVER VENTURES; TCV V, L.P.; LINDA STINSON; THE STINSON 2009 GRANTOR RETAINED ANNUITY TRUST; STARTUP CAPITAL VENTURES, L.P.; STEPHEN SHAPER; SEQUOIA GROWTH FUND IIII, L.P.; SEQUOIA CAPITAL FRANCHISE PARTNERS, LLC; SEQUOIA CAPITAL GROWTH III PRINCIPALS FUND, L.P.,

        Defendants.

------------------------------

NATIVE AMERICAN FINANCIAL SERVICES ASSOCIATION,

        Amicus Supporting Appellants.

DARLENE GIBBS; STEPHANIE EDWARDS; LULA WILLIAMS; PATRICK INSCHO; LAWRENCE MWETHUKU; GEORGE HENGLE; TAMARA PRICE; SHERRY BLACKBURN, on behalf of themselves and all individuals similarly situated,

        Plaintiffs – Appellees,

    v.

MICHAEL STINSON; 7HBF NO. 2; LINDA STINSON; THE STINSON 2009 GRANTOR RETAINED ANNUITY TRUST; STARTUP CAPITAL VENTURES, L.P.; STEPHEN SHAPER,

        Defendants – Appellants,

and

SEQUOIA CAPITAL OPERATIONS, LLC; SEQUOIA CAPITAL FRANCHISE PARTNERS, L.P.; SEQUOIA CAPITAL IX, L.P.; SEQUOIA GROWTH FUND IIII, L.P.; SEQUOIA ENTREPRENEURS ANNEX FUND, L.P.; SEQUIOA CAPITAL GROWTH III PRINCIPALS FUND, LLC; SEQUOIA CAPITAL FRANCHISE FUND, L.P.; SEQUOIA CAPITAL GROWTH PARTNERS III, L.P.; SEQUOIA CAPITAL FRANCHISE PARTNERS, LLC; SEQUOIA CAPITAL GROWTH III PRINCIPALS FUND, L.P.; SEQUOIA CAPITAL GROWTH FUND III, L.P.; JOHN DREW; TECHNOLOGY CROSSOVER VENTURES; TCV V, L.P.,

        Defendants.

------------------------------

NATIVE AMERICAN FINANCIAL SERVICES ASSOCIATION,

        Amicus Supporting Appellants.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  M. Hannah Lauck, District Judge.  (3:18-cv-00676-MHL)

Submitted:  May 29, 2020                                              Decided:  July 21, 2020

Before GREGORY, Chief Judge, MOTZ, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Chief Judge Gregory and Judge Motz joined.

Stephen D. Hibbard, San Francisco, California, Todd R. Geremia, Shirley M. Chan, JONES DAY, New York, New York; Richard L. Scheff, David F. Herman, ARMSTRONG TEASDALE LLP, Philadelphia, Pennsylvania, for Appellants.  Kristi C. Kelly, Andrew J. Guzzo, KELLY GUZZO, PLC, Fairfax, Virginia; Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C.; Leonard A. Bennett, Craig C. Marchiando, Elizabeth W. Hanes, CONSUMER LITIGATION ASSOCIATES, P.C., Newport News, Virginia; Anna C. Haac, TYCKO & ZAVAREEI LLP, Washington, D.C., for Appellees. Patrick O. Daugherty, Frances B. Morris, VAN NESS FELDMAN LLP, Washington, D.C., for Amicus Curiae.

AGEE, Circuit Judge:

In this appeal, we again consider the enforceability of arbitration agreements included within the terms of payday loans issued by two online lenders. After a group of borrowers filed suit against certain entities and individuals (collectively, the "Sequoia Defendants"), challenging the legality of the loans issued, the Sequoia Defendants filed a motion to compel arbitration. The district court denied the motion on the basis that the arbitration agreements amounted to a prospective waiver. The Sequoia Defendants now appeal. For the reasons set forth below, we affirm the judgment of the district court.

I.

The plaintiffs are Virginia consumers who borrowed money between 2013 and 2016 from one of two online lenders owned by a sovereign Native American tribe.[1] The first lender, Plain Green, LLC, is owned and operated by the Chippewa Cree Tribe of the Rocky Boy's Reservation in Montana. The second, Great Plains Lending, LLC, is owned and

---

[1] Plaintiffs Lawrence Mwethuku and Darlene Gibbs took out loans from Plain Green, LLC in 2013 and 2016, respectively. Meanwhile, plaintiffs Stephanie Edwards, Lula Williams, and Patrick Inscho received loans from Great Plains Lending, LLC in 2015, 2016, and 2016, respectively.

These plaintiffs also filed suit against certain other entities and individuals that had invested in these same tribal lenders. The district court denied the motion to compel arbitration filed by those entities for substantially the same reasons it denied the motion to compel in this case. *See Gibbs v. Haynes Invs., LLC.*, 368 F. Supp. 3d 901, 920–25 (E.D. Va. 2019). Today, we are affirming the judgment of the district court in that case. *Gibbs v. Haynes Invs., LLC*, No. 19-1434, slip op. at 15–24 (4th Cir. July 21, 2020).

operated by the Otoe-Missouria Tribe of Oklahoma.[2] Although Virginia usury law generally prohibits interest rates in excess of twelve percent, Va. Code Ann. § 6.2-303, the laws of both Tribes permit higher rates. As a result, the interest rates on the loans—which varied in principal amounts from $500 to $1,700—ranged from 219.38% to 373.97%. J.A. 234, 246.

As recounted in *Haynes Investments,* No. 19-1434, slip op. at 4–5—which considered the same agreements that are at issue here—each borrower completed the loan application process by electronically signing a contract containing (1) the terms governing the loan (the "loan agreement") as well as (2) an agreement to arbitrate any disputes (the "arbitration agreement"). Both agreements contained choice-of-law provisions requiring the application of tribal law. For example, Gibbs's 2016 Plain Green loan agreement stipulated that the loan "shall be governed by the laws of the tribe," J.A. 202, and that "[t]his Agreement and the Agreement to Arbitrate are governed by Tribal Law," J.A. 207. In turn, Gibbs's arbitration agreement stated that it "shall be governed by tribal law" and the "arbitrator shall apply Tribal Law." J.A. 209. Similarly, Mwethuku's 2013 contract provided that both the loan and arbitration agreements would be "governed by the law of

---

[2] The district court did not consider—nor does it appear that the borrowers alleged—any specific claims against the lending operations themselves. Rather, they brought suit against the Sequoia Defendants, who are, according to the borrowers' complaint, "the owners and investors of Think Finance, [LLC,]" the lending enterprise allegedly responsible for setting up the tribal loan operations. J.A. 21. For instance, one of the defendants, Sequoia Capital Operations, is a venture capital firm that, according to the complaint, "owned approximately [twenty-five percent] of the interest in Think Finance" and, "[t]hrough its ownership[,] operated and participated in the affairs of the . . . lending scheme[.]" J.A. 25.

the Chippewa Cree Tribe." J.A. 250; *see also* J.A. 245 (providing the loan agreement was "subject solely to the exclusive laws and jurisdiction of the Chippewa Cree Tribe").

Likewise, all three 2015 and 2016 Great Plains loan agreements indicated the lender could choose to voluntarily use federal laws as guidance, but that the agreements ultimately would be governed by tribal law: "This Agreement and the Agreement to Arbitrate are governed by Tribal law and such federal law as is applicable under the Indian Commerce Clause," but "[s]uch voluntary use [of federal laws as guidelines for the provision of services] does not represent acquiescence of the Otoe-Missouria Tribe to any federal law unless found expressly applicable to the operations of the Otoe-Missouria Tribe." J.A. 218, 229, 239. Similarly, all of the Great Plains arbitration agreements specified that "[t]his agreement to arbitrate shall be governed by tribal law"; "[t]he arbitrator shall apply Tribal Law"; and the arbitration award "must be consistent with this Agreement and Tribal Law[.]" J.A. 220, 230, 241.

Finally, a number of other provisions in both lenders' loan and arbitration agreements reinforced the application of tribal law. For instance, although the borrowers could opt out of arbitration, any dispute resolution process had to occur in the tribal court system and comply with tribal law. Thus, Mwethuku's 2013 loan agreement provided that "[i]n the event you opt out of this agreement to arbitrate, any disputes hereunder shall nonetheless be governed under the laws of the Chippewa Cree Tribe and must be brought within the court system thereof." J.A. 249; *see also* J.A. 208, 218–19, 229, 240.

After receiving the loans, the borrowers brought a putative class action complaint alleging, among other claims, that the lenders' loans were unlawful under Virginia's usury

6

laws and that the Sequoia Defendants' conduct violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In response, the Sequoia Defendants moved to compel arbitration under 9 U.S.C. § 4 or, alternatively, to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The district court denied both motions.

As relevant to the motion to compel arbitration, the district court relied upon two Fourth Circuit cases—*Hayes v. Delbert Services Corporation*, 811 F.3d 666, 671 (4th Cir. 2016), and *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 332 (4th Cir. 2017)—both of which also considered tribal arbitration agreements with choice-of-law clauses providing for the nearly exclusive application of tribal law, to the exclusion of state and federal law. As in those cases, the district court concluded that because the choice-of-law provisions of the arbitration agreements "sought to apply Tribal law to the exclusion of federal law"—including the assertion of any federal statutory claims by the borrowers—the agreements "contravene[d] the prospective waiver doctrine[.]" J.A. 363, 365. Thus, the court concluded, the arbitration agreements were unenforceable.

The Sequoia Defendants timely appealed, arguing that: (1) the district court ignored the arbitration agreements' delegation provision requiring an arbitrator to resolve all threshold issues of arbitrability, including whether the choice-of-law provisions amounted to a prospective waiver; and (2) even if the court was correct to consider the effect of the choice-of-law provisions, they did not amount to a prospective waiver. We address each issue in turn, mindful of the "strong federal policy in favor of enforcing arbitration agreements." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985).

7

II.

We turn first to the delegation clauses. Each of the arbitration agreements contained a delegation clause stipulating that the parties would arbitrate "any issue concerning the validity, enforceability, or scope of this Agreement or this Agreement to Arbitrate." J.A. 240; *see also* J.A. 208, 219, 229, 249. As a result, the Sequoia Defendants argue, any threshold questions as to the enforceability of the arbitration agreement should have first been sent to an arbitrator. We disagree. Because the borrowers sufficiently challenged the enforceability of the delegation clauses, the district court was correct to consider the enforceability of the arbitration agreements.

A.

The Supreme Court has concluded that when a litigant specifically challenges the enforceability of an arbitration agreement with a delegation clause, the challenge must be submitted to the arbitrator *unless* the plaintiff has lodged a specific objection to the delegation clause. When such a specific objection is made, the court may consider it. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). Thus, in assessing the enforceability of an arbitration agreement containing a delegation provision, "we first must decide whether [the plaintiff] lodged a challenge against the delegation provision . . . . Second, if we conclude that [it] specifically challenged the enforceability of the delegation provision, we then must decide whether the delegation provision is unenforceable 'upon such grounds as exist at law or in equity.'" *Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 453 (4th Cir. 2017) (quoting 9 U.S.C. § 2).

8

We note that "[i]n specifically challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions." *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226–27 (3d Cir. 2018). As a result, courts have construed a party's argument that the "delegation clause suffers from the same defect as the arbitration provision" to be a sufficient challenge to the delegation provision itself. *Id.* (internal quotation marks omitted); *see also Rent-A-Center*, 561 U.S. at 74 (observing that had the plaintiff "challenged the delegation provision by arguing that [the purportedly unconscionable arbitration procedures] *as applied* to that delegation provision rendered *that provision* unconscionable, the challenge should have been considered by the court").

B.

With this legal framework in mind, we now consider whether the borrowers have lodged a sufficient challenge to the delegation provisions and, if so, whether the district court properly considered the challenge. The Sequoia Defendants contend the district court erroneously considered the enforceability of the delegation provisions and instead should have let the arbitrator resolve all threshold issues of arbitrability—including whether the arbitration agreements had been rendered void by the prospective waiver doctrine— because the arbitration agreements contained a valid, enforceable delegation clause. But this argument fails for the same reason that it failed in *Haynes*: the borrowers challenged the delegation clause with "sufficient force and specificity," *Hayes*, 811 F.3d at 671 n.1, to occasion the district court's review as to whether the agreements to arbitrate were valid. *Haynes,* No. 19-1434, slip op. at 10–12. Specifically, in their brief opposing the Sequoia

9

Defendants' motion to compel arbitration, they contended that the delegation clause was unenforceable because of the prospective waiver doctrine. Opp. to Mot. to Compel at 20–23, *Gibbs v. Stinson,* No. 3:18-cv-676-MHL (E.D. Va. Apr. 1, 2019), ECF No. 84.

In turn, such a "reference [to] the provision in [an] opposition to a motion to compel arbitration" is all that is required to mount a challenge to the delegation clause. *MacDonald*, 883 F.3d at 226; *see also Rent-A-Center*, 561 U.S. at 74 (observing that had the plaintiff "challenged the delegation provision by arguing [in his opposition to the motion to compel arbitration that the purportedly unconscionable arbitration procedures] *as applied* to that delegation provision rendered *that provision* unconscionable, the challenge should have been considered by the court"). Thus, as the district court correctly noted, the borrowers "challenge[d] both the *validity* of the arbitration agreement and the validity of the delegation clause" such that its task was to "determine . . . whether a valid delegation provision exists." J.A. 356–57.[3]

In sum, given that the borrowers specifically challenged the delegation provision, the question of its enforceability was one for the courts—rather than the arbitrator—to decide. Further, because the challenge to the delegation provision necessarily encompassed

---

[3] Like the defendants in *Haynes*, the Sequoia Defendants rely on *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019), for the proposition that if the contract "delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Id.* at 530. However, *Schein* is inapposite because that case "dealt with an exception to the threshold arbitrability question—the so-called 'wholly groundless' exception [which concerns the arbitrability or non-arbitrability of certain issues]—not a challenge to the validity of an arbitration clause itself." *Gingras v. Think Finance Inc.*, 922 F.3d 112, 126 n.3 (2d Cir. 2019). Further, as *Schein* itself noted, "before referring a dispute to an arbitrator, the court must determine [under 9 U.S.C. § 2] whether a valid arbitration agreement exists." 139 S. Ct. at 530.

and included arguments that related to the entire arbitration agreement, the district court did not err by assessing those arguments.

## III.

### A.

We turn now to the question of whether the choice-of-law provisions amount to a prospective waiver, rendering the delegation clause unenforceable. Under the Federal Arbitration Act (the "FAA"), arbitration contracts are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Courts must therefore enforce arbitration agreements "on an equal footing with other contracts." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). And in this vein, a court may also invalidate an arbitration agreement based on "generally applicable contract defenses." *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017) (internal quotation marks omitted).

Consistent with contract principles, the Supreme Court has recognized that arbitration agreements that operate "as a prospective waiver of a party's right to pursue statutory remedies" are not enforceable because they are in violation of public policy. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985). Therefore, "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum," courts should enforce the parties' contract under the FAA. *Id.* at 637. But where an arbitration agreement prevents a litigant from vindicating federal statutory rights, courts will not enforce the agreement. *Id.*

11

Of course, a "foreign choice of law provision, of itself, will not trigger application of the prospective waiver doctrine." *Dillon*, 856 F.3d at 334. "Instead, a court first must examine whether, as a matter of law, the choice-of-forum and choice-of-law clauses operate in tandem as a prospective waiver of a party's right to pursue statutory remedies." *Id.* (internal quotation marks omitted).

B.

Just as in *Haynes*, we discern no material distinction between the case at hand and our precedent in *Hayes* and *Dillon*. Because the choice-of-law provisions in both the Great Plains and Plain Green arbitration agreements prevent the borrowers from effectively vindicating any federal statutory claims, they violate the prospective waiver rule. As a result, the delegation provisions—and thus the arbitration agreements—are unenforceable.

Specifically, all of the Great Plains and Plain Green arbitration agreements contain choice-of-law provisions (1) providing they "shall be governed by tribal law"; (2) requiring that any arbitrator "apply Tribal law and the terms of this Agreement" (or similar language); and (3) mandating that the arbitrator's decision "be consistent with . . . Tribal Law" ("and if it is not, [that] it may be set aside by a Tribal court upon judicial review"). J.A. 241; *see also* J.A. 209, 220, 230, 250. The terms also limit the authority of the arbitrator to provide awards to those "remedies available under Tribal Law." J.A. 241; *see also* J.A. 209, 220, 230, 250. Although such provisions do not explicitly disclaim the applicability of federal law, they mandate the primacy and effective control of tribal law in resolving any disputes arising out of these agreements. And such law would, as discussed at length in *Haynes*, No. 19-1434, slip op. at 17–22, prevent claimants from vindicating a

12

RICO claim for treble damages against entities and individuals like the Sequoia Defendants.

Further, other clauses within both the Plain Green and Great Plains loan and arbitration agreements—such as those requiring the application of tribal law regardless of the location of the arbitration; limiting any appeals to consideration of, among one of two grounds, the award's conformance with tribal law; and requiring confirmation of the arbitral award in tribal courts—reinforce this point. *Id.* at 18–19, 22 n.9.

The Sequoia Defendants emphasize that the language of the arbitration agreements would not prevent the borrowers from asserting their federal statutory claims in arbitration, given that the agreements provide that any "Dispute"—defined as "all federal, state or Tribal Law claims or demands"—"will be resolved by binding arbitration." J.A. 208, 219. But such language does not counteract the effect of the choice-of-law provisions. As recounted in *Haynes*, even if a claimant were to attempt to assert a RICO claim for treble damages against an entity or individual related to a tribal lender, tribal law would prevent the vindication of such a claim. *See Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013) (providing the prospective waiver doctrine applies when it is evident the claimant will not be able to "effectively . . . vindicate its statutory cause of action in the arbitral forum"); *see also Gingras*, 922 F.3d at 127 n.4 (rejecting the argument that a similar "disputes" definition contained in the arbitration agreement permitted the application of

13

federal law because of the presence of choice-of-law provisions that implicitly disclaimed the application of federal law).[4]

Finally, the Sequoia Defendants argue that the prospective waiver doctrine cannot be applied at the arbitration-enforcement stage, only at the award-enforcement stage. However, this conclusion has only been applied in cases in which: (1) there is uncertainty as to the effect of the choice-of-law provision at issue; and/or (2) the explicitly international nature of those arbitration agreements—and the accompanying international comity concerns—have reinforced the need for such a delay. *See Haynes*, No. 19-1434, slip op. at 22 n.10 (citing *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 371–73 (4th Cir. 2012)); *see also Mitsubishi*, 473 U.S. at 629 (observing that "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in the domestic context"). None of these concerns are at play here.

In summary, because the effect of the choice-of-law provisions is to stymie the vindication of the federal statutory claims that the borrowers seek to enforce, they amount

---

[4] To the extent the Sequoia Defendants argue that the district court should have relied on their "express representations that they will *not* take the position in an arbitration that [the borrowers] . . . may not pursue their remedies for their claims under federal and Virginia law," Opening Br. at 40, we have previously rejected similar arguments. Specifically, *Dillon* refused to accept the defendant's "concession to the application of federal substantive law in arbitration notwithstanding the unambiguous choice of tribal law in the arbitration agreement" "because these choice of law provisions were essential to the purpose of the arbitration agreement [and the defendant's] consent to application of federal law would defeat the purpose of the arbitration agreement in its entirety." 856 F.3d at 336.

14

to a prospective waiver and render the delegation provisions unenforceable. Consequently, the "entire arbitration agreement is unenforceable." *Dillon*, 856 F.3d at 335–37; *see also Hayes*, 811 F.3d at 669–71, 675. For these reasons, we conclude that the district court had the authority to decide whether the arbitration agreements were valid, correctly decided they were not, and did not err in denying the motion to compel arbitration.

IV.

We affirm the judgment of the district court. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this Court and argument would not aid the decisional process.

*AFFIRMED*[*]

_____

[*] This opinion is published without oral argument pursuant to this Court's Standing Order 20-01.